UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOARD OF TRUSTEES FOR THE LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TURNER GROUP CONSTRUCTION,<br><br>Defendant. | Case No. 20-cv-01244-DMR<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 31 |

Plaintiffs are the Boards of Trustees for the Laborers Health and Welfare Trust Fund for Northern California, Laborers Pension Trust Fund for Northern California, Laborers Vacation-Holiday Trust Fund for Northern California, and Laborers Training and Retraining Trust Fund for Northern California ("Trust Funds"). [Docket No. 1 ("Compl.") at 2.] Plaintiffs filed this case on February 19, 2020, alleging that Defendant Turner Group Construction breached the terms of a collective bargaining agreement in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Plaintiffs now move for summary judgment. [Docket Nos. 31 ("Mot."), 37 ("Reply").] Turner Group opposes. [Docket No. 35 ("Opp.").] This matter is suitable for determination without oral argument. Civ. L.R. 7-1(b).

For the reasons stated below, Plaintiffs' motion is denied.

## I. BACKGROUND

### A. Collective Bargaining Agreement

The Trust Funds are multiemployer employee benefit plans[1] governed by sections 302(c)(5), 302(c)(6), and 302(c)(9) of the LMRA, 29 U.S.C. §§ 186(c)(5)-(6), (9), and ERISA, 29 U.S.C. § 1001 *et seq.* [Docket No. 31-2, Declaration of Michelle Lauziere ("Lauziere Decl.") ¶¶ 2-3.] Each is each subject to a written trust agreement. *Id.* ¶ 3; *see id.*, Ex. A ("Trust Agreements"). Turner Group is a small construction business formed in 2005. [Docket No. 35-1, Declaration of Len Turner ("Turner Decl.") ¶¶ 2-3.] In March 2007, Turner Group sought to work on a construction project for the Fox Theater in Oakland. *Id.* ¶ 6. The project required Turner Group employees to become members of the Northern California District Council of Laborers ("Union"). *Id.* In March 2007,[2] Turner Group entered into a one-job agreement with the Union to cover work for the Fox Theater project. *Id.*; Lauziere Decl. ¶ 6; Lauziere Decl., Ex. G. The one-job agreement bound Turner Group to the terms of the Union's collective bargaining agreement ("CBA") for the work performed at that job. Lauziere Decl. ¶ 6; *id.*, Exs. D (CBA for 2012-2015), E (CBA for 2014-2019). The CBA incorporates the various Trust Agreements. Lauziere Decl. ¶ 6.

Turner Group later agreed to continue contracting with the Union beyond the one-time Fox Theater job. In May 2007, Turner Group authorized the Associated General Contractors of California ("AGC") to execute the CBA on behalf of Turner Group. Turner Decl. ¶ 8; Lauziere Decl. ¶ 6; Lauziere Decl., F (power of attorney). Len Turner, CEO and sole shareholder of Turner Group, avers that Turner Group provided the authorization only after the Union agreed that the jobs Turner Group bid before entering into the agreement would be exempt from its terms. Turner Decl. ¶¶ 7-8. Therefore, Turner Group was not obligated to make contributions to the Trust Funds for

---

[1] "The term 'multiemployer plan' means a plan--(i) to which more than one employer is required to contribute, (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and (iii) which satisfies such other requirements as the Secretary may prescribe by regulation." 29 U.S.C. § 1002(37)(A).

[2] Lauziere's declaration states that the one-job agreement was signed in May 2007, which appears to contradict the exhibit attached to that declaration as well as Turner's declaration. *See* Lauziere Decl. ¶ 6. The discrepancy does not seem to be material to this motion.

work performed on those jobs. *Id.* ¶ 8.

The CBA requires Turner Group to promptly pay all employer contributions for covered work to the Trust Funds, except for the exempted jobs described above. *See* Lauziere Decl. ¶ 7. It also provides that Turner Group must submit to audits of its records so that the Trust Funds can confirm whether the company has timely paid all required contributions:

> Each Individual Employer, upon request of any Trust Fund specified in this Agreement, shall permit a Trust Fund Auditor to review any and all records relevant to the enforcement of the provisions of this Agreement pertaining to the Trust Funds. Such review shall be permitted not less than ten (10) working days after demand.

*Id.*, Ex. D, Section 7(B); *id.*, Ex. E, Section 7(B). The individual Trust Agreements, which are incorporated into the CBA, also require employers to submit to audits:

> Upon request in writing from the Board of Trustees, an Individual Employer will permit a Trust Fund Auditor to enter upon the premises of such Individual Employer during business hours, at a reasonable time or times, not less than two (2) working days after such request, and to examine and copy such books, records, papers, or reports of such Individual Employer as may be necessary to determine whether the Individual Employer is making full and prompt payment of all sums required to be paid by him to the Fund.

Lauziere Decl. ¶ 10; *id.*, Ex. A at pp. 15, 45, 76, 106.

Plaintiffs represent that they repeatedly demanded that Turner Group submit to an audit covering the time period from January 1, 2012 to the present. Lauziere Decl. ¶ 11. It is undisputed that Turner Group has not allowed Plaintiffs to proceed with the audit.

**B.     First Audit**

To explain its refusal, Turner Group represents that Plaintiffs performed a previous audit in 2010 spanning the period of June 2007 through December 2009, and that audit was riddled with errors. *See* Turner Decl. ¶¶ 11-59. Specifically, Plaintiffs initially told Turner Group that it owed $343,428.75 in past contributions and liquidated damages. *Id.* ¶ 13; *see id.* Ex. 1 (letters from Plaintiffs to Turner Group dated November 5, 2010 and November 29, 2010). After Turner Group pointed out several errors in Plaintiffs' calculations, Plaintiffs reduced the amount they claimed was owed to $106,828.97. *Id.* ¶ 15; *see id.*, Ex. 1 (summary of amount due, dated February 17, 2011). Turner Group again identified several errors, which it presented to Plaintiffs with documents

supporting its position. *Id.* ¶ 16. Turner Group avers that Plaintiffs asked for additional explanation and documentation, which Turner Group provided, but then dropped the issue for five years. *Id.* ¶¶ 17-18. In February 2016, Plaintiffs again contacted Turner Group, representing that the amount now owed was $68,203.05. *Id.* ¶ 18; *see id.* Ex. 3 (letter from Plaintiffs to Turner Group, dated February 16, 2016). Turner Group states that the claimed amount included unpaid contributions for jobs it had bid before Turner Group entered into the CBA, which the Union and the company agreed would be exempt from the CBA. *Id.* ¶ 19. Turner Group pointed out the error to Plaintiffs, who—a year later, in February 2017—revised the amount claimed owed to $42,047.54. *Id.* ¶¶ 20-21; *see id.*, Ex. 4 (letter from Plaintiffs to Turner Group dated February 3, 2017). The new demand again contained errors, including contributions allegedly owed based on jobs Turner Group bid before entering the CBA. *Id.* ¶¶ 22-23. Over the next several months. Turner Group continued to try to resolve the issues with Plaintiffs, including by scheduling a meeting with Plaintiffs' representatives for October 17, 2017. *Id.* ¶¶ 27-29. The meeting was postponed at Plaintiffs' request, and Plaintiffs did not contact Turner Group again for one and a half years. *Id.* ¶ 33. In April 2019, Plaintiffs told Turner Group that they had made some adjustments to the audit worksheets and as a result, Turner Group now owed $11,609.40 in unpaid contributions. *Id.* ¶ 36; *see id.*, Ex. 10 (letter from Plaintiffs to Turner Group dated April 29, 2019). Plaintiffs demanded payment of that sum within 10 days, and in a follow-up letter, threatened to refer the matter to collections if payment was not received. *Id.* ¶¶ 36-38. Turner Group avers that the new figure still contained errors, including calculations based on work that was not covered by the CBA. *Id.* ¶¶ 37, 39-40. In September 2019, after Turner Group had provided documentation contradicting Plaintiffs' calculations, Plaintiffs told Turner Group that the new revised amount was $27,064.68. *Id.* ¶ 42; *id.*, Ex. 12 (summary of amount due, dated September 18, 2019). Len Turner attempted to meet with Plaintiffs' representatives to ask what calculations Plaintiffs used to determine that amount, but Plaintiffs canceled the meeting and never rescheduled. *Id.* ¶¶ 43-45. On November 20, 2019, Plaintiffs notified Turner Group that the Trust Funds had agreed to not take further action on the 2010 audit. *Id.* ¶ 50; *see id.*, Ex. 18 (letter from Plaintiffs' attorney to Turner Group, dated November 20, 2019). Despite their representation that the matter was over, Plaintiffs sent Turner Group a bill for $4,936.96 in June 2020. *Id.* ¶ 58;

4

*see id.*, Ex. 22 (statement of account dated June 1, 2020). In August 2020, Plaintiffs' attorney again informed Turner Group that the matter of the 2010 audit was "closed." *Id.* ¶ 59. Nevertheless, Plaintiffs continued to bill Turner Group for $4,936.96 through October 2020. *Id.* ¶ 60. Turner Group states that it never received an explanation for numerous errors with the first audit. *See id.* ¶ 59.

### C.  Second Audit

Concurrently with some of the above events, Plaintiffs demanded a second audit in July 2017, before the first audit had been resolved. Turner Decl. ¶ 25. Plaintiffs informed Turner Group that the second audit would cover July 2010 through July 2017. *Id.* ¶ 25; *see id.*, Ex. 7 (letter from Plaintiffs to Turner Group, dated July 11, 2017). During one of the meetings about the first audit, Len Turner expressed concern that the proposed time period for the second audit was excessive and punitive. *Id.* ¶ 27. The parties were supposed to discuss the second audit during the scheduled October 17, 2017 meeting, but as noted above, Plaintiffs canceled that meeting and did not contact Turner Group again for a year and a half. *Id.* ¶¶ 30, 32. In their April 29, 2019 correspondence, Plaintiffs told Turner Group that the second audit would cover the period from January 2015 through the first quarter of 2019. *Id.* ¶ 35. Later, in the parties' September 2019 meeting, Len Turner expressed concern about the length of the first audit and the many errors that Turner Group identified in Plaintiffs' calculations. *Id.* ¶ 39. He wanted to confirm that these issues would not be repeated in a second audit. *See id.* In an email dated October 29, 2019, Plaintiffs informed Len Turner that the second audit would start from the "point where the last audit left off." *Id.* ¶ 46; *see id.*, Ex. 16 (letter email from Plaintiffs' attorney to Len Turner, dated Oct. 29, 2019). In their November 20, 2019 letter, Plaintiffs stated that Turner Group "is refusing the Trust Funds to conduct an audit" and that they would "proceed with litigation" if the company did not submit to the audit. *Id.* ¶ 50; *see id.*, Ex. 18. Turner Group responded that it was willing to participate in an audit but it first wanted to understand "the length of the period covered by the audit, the procedures for the audit, and how the Trust Funds would assure that its procedures would avoid the same errors" as in the first audit. *Id.* ¶ 51. In an email dated December 6, 2019, Plaintiffs appeared to reject Turner Group's request for further information, stating that they had already "met with you to discuss the matter on various

5

occasions." *Id.* ¶ 52; *see also id.*, Ex. 20. The email also informed Turner Group that the audit would cover 2012 through the present, and that Plaintiffs would file a lawsuit if Turner Group refused. *See id.* On December 18, 2019, Turner Group made a final request to Plaintiffs to meet to discuss the issues with the first audit and how those could be avoided in the second audit. *Id.* ¶ 56; *id.*, Ex. 21 (email from Len Turner to Plaintiffs' attorney, dated Dec. 18, 2019). Plaintiffs did not respond. *Id.* ¶ 56. They filed this lawsuit approximately two months later.

Plaintiffs bring a claim for breach of the collective bargaining agreement under section 301 of the LMRA, 29 U.S.C. § 185, and section 502 of ERISA, 29 U.S.C. § 1132. They seek injunctive relief compelling Turner Group to submit to the demanded audit, actual damages, any delinquent contributions identified by such an audit, and attorneys' fees and costs.

## II. LEGAL STANDARDS

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Id.* at 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving part has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so

that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

Plaintiffs move for summary judgment, arguing that (1) Turner Group is required by the terms of the CBA to submit to the demanded audit; (2) Plaintiffs are entitled to attorneys' fees and costs; and (3) Plaintiffs are entitled to amend any judgment entered in their favor to include any delinquent contributions uncovered by the audit. Turner Group opposes each of these arguments and also contends that Plaintiffs are barred from obtaining equitable relief under the unclean hands doctrine. Because the court finds that there are disputed issues of material fact as to Turner Group's unclean hands defense, it does not reach the issues of damages or attorneys' fees.

### A. Audit

Section 301 of the LMRA permits "[s]uits for violation of contracts between an employer and a labor organization representing employees . . . ." 29 U.S.C. § 185(a). Plaintiffs, as Trustees and fiduciaries of the Trust Funds, are authorized under ERISA to bring this action. 29 U.S.C. § 1132(a)(3). ERISA requires that employee benefit plans "be established as written formal trusts." *Santa Monica Culinary Welfare Fund v. Miramar Hotel Corp.*, 920 F.2d 1491, 1493 (9th Cir. 1990) ("*Miramar*") (citing 29 U.S.C. § 1103). Accordingly, "the role of the trustees is generally defined by the trust documents, to the extent these documents are consistent with the provisions of ERISA." *Id.* In actions brought to enforce trust agreements, "[t]he Ninth Circuit has held that when the trust agreement terms allow for [] an audit, the court may compel the audit specified in the trust agreement terms." *Bd. of Trustees v. RBS Washington Blvd, LLC*, No. 09-cv-00660-WHA, 2010 WL 145097, at *5 (N.D. Cal. Jan. 8, 2010) (citing *Miramar*, 920 F.2d at 1494).

Plaintiffs argue that the clear language of the CBA and the Trust Agreements gives them the right to conduct an audit of Turner Group's records from January 1, 2012 to the present. Mot. at 8-10. Turner Group does not dispute that Plaintiffs generally have the right to conduct audits; instead, it argues that Plaintiffs are not entitled to an audit spanning the past 9 years. It contends that while an audit might show that Turner Group is liable for unpaid contributions, the statute of limitations for an action based on those contributions is four years prior to the filing of the complaint in this

case. *See* Opp. at 4-5. Thus, Turner Group asserts, Plaintiffs should only be allowed to audit its records for the period within the statute of limitations for a contributions action. Plaintiffs respond that the statute of limitations does not begin to run until they have reason to know of the underpayments (which they currently do not), and so any delinquencies potentially uncovered by the requested audit may fall within the statute of limitations. Reply at 4-5.

Turner Group's statute of limitations argument is not compelling. The statute of limitations for an ERISA action is governed by a state's statute of limitations for breach of contract—in California, four years. *N. California Retail Clerks Unions & Food Employers Joint Pension Tr. Fund v. Jumbo Markets, Inc.*, 906 F.2d 1371, 1372 (9th Cir. 1990). An ERISA claim accrues when "the plaintiff knows or has reason to know of the injury that is the basis of the action." *Id.* It is undisputed that Plaintiffs currently do not know whether Turner Group failed to make contributions for any period covered by the requested audit. An audit may reveal previously unknown underpayments and Plaintiffs could file a contributions action for any underpayments about which they did not know or have reason to know before the audit.[3] *See Jumbo Markets*, 906 F.2d at 1372. Therefore, any underpayments during the proposed timeline could fall within the statute of limitations for contributions actions.

Turner Group also argues that (1) accepting Plaintiffs' argument would allow trust funds to potentially "demand an audit covering decades"; and (2) Plaintiffs could have conducted an audit much sooner and they "should not profit because they elected to not pursue their rights." Opp. at 4-6. With respect to the first argument, the court need not decide whether Plaintiffs could demand an "audit covering decades," because the one at issue does not. Instead, it covers a period of nine years (from 2012 to the present). There is no language in the CBA or Trust Agreements that limits the time period covered by an audit, and at least one court has found that an audit spanning 10 years is not unreasonable.[4] *See Trustees of Chicago Plastering Inst. Pension Fund v. R.G. Const. Servs.,*

---

[3] Turner Group argues that *Jumbo Market* is distinguishable because in that case, the employer breached its fiduciary duties. Opp. at 6. The court rejects that argument because the factual distinction is immaterial to the Ninth Circuit's determination of when a claim accrues in a federal action. *See Jumbo Markets*, 906 F.2d at 1372.

[4] Turner Group distinguishes *Chicago Plastering* on the basis that the court allowed a 10-year audit

8

1    *Inc.*, 2009 WL 1733036, at *15 (N.D. Ill. June 16, 2009). Further, Turner Group represents that it has not "worked on any construction projects since late 2016 or early 2017," so the second audit would presumably cover at most five years. *See* Opp. at 1. Therefore, Turner Group's argument about the time period for the proposed audit is not compelling.

Although Turner Group is not explicit on this point, its second argument seems to invoke the equitable doctrine of laches. "Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that "one who seeks the help of a court of equity must not sleep on his rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (internal quotation marks and citation omitted). However, Turner Group does not explain its argument or cite relevant authority and the court declines to speculate as to what the argument might be.

In sum, the court finds that the proposed time frame for the second audit is not on its own unreasonable.

### B.  Unclean Hands

Turner Group argues that even if the CBA permits an audit for the requested time period, Plaintiffs are not entitled to the injunctive relief they request because of the doctrine of unclean hands. Mot. at 8. The unclean hands defense rests on the "equitable maxim that 'he who comes into equity must come with clean hands.'" *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000) (quoting *Precision Instrument Mfg. Co.*, 324 U.S. at 814). "To prove unclean hands, appellate courts have required two things. First, a defendant must prove the plaintiff engaged in inequitable conduct and, second, that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant." *Intamin, Ltd. v. Magnetar Techs. Corp.*, 623 F. Supp. 2d 1055, 1074 (C.D. Cal. 2009) (citing cases), *aff'd*, 404 F. App'x 496 (Fed. Cir. 2010). Application of the

---

in a jurisdiction that provides a 10-year statute of limitations for breach of contract claims. *See* Opp. at 4-5. For the reasons explained above, the court finds that the audit period is not necessarily limited by the statute of limitations for contributions actions.

unclean hands defense is "primarily a question of fact" and thus usually reserved for a jury. *See Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989).

Turner Group argues that Plaintiffs are not entitled to seek an order compelling a second audit because of their inequitable conduct with respect to both audits. As described above, Turner Group testifies that Plaintiffs made numerous and repeated errors in the first audit. *See* Turner Decl. ¶¶ 10-59. According to Turner Group, Plaintiffs initially demanded a payment of $343,428.75 in past unpaid contributions, but repeatedly revised this amount over a span of years, sometimes without explanation. *See id.* ¶¶ 15, 18, 22-23, 36-38, 42-45. Turner Group also avers that Plaintiffs did not respond to requests for clarification and dropped the issue for years at a time. *See id.* ¶¶ 17-18, 33. In November 2019, Plaintiffs told Turner Group that they agreed to not take further action on the 2010 audit, but despite that representation, they continued to bill Turner Group for liquidated damages for almost a year afterward. *Id.* ¶¶ 50, 58-60. Turner Group asserts that it is resisting the second audit largely because of the concern that the errors and delays in the first audit will be repeated in the second audit. *Id.* ¶¶ 39, 59. It also contends that Plaintiffs' demands for a second audit have been inconsistent with respect to the proposed timeframe and that Plaintiffs have not responded to Turner Group's concerns or requests for clarification. Plaintiffs do not dispute Turner Group's characterization of these events and they did not submit competing evidence on this issue. Instead, they argue that the events of the first audit are irrelevant to the requested second audit. *See* Reply at 6.

Viewing the evidence in the light most favorable to Turner Group, the court finds that there is a triable issue of fact as to whether the unclean hands doctrine applies to bar Plaintiffs' requested relief. A reasonable fact finder could find that Plaintiffs committed many errors in performing the first audit, failed to correct those errors when Turner Group pointed them out, unreasonably prolonged the audit, continued to bill Turner Group for damages after telling the company that they were no longer pursuing the matter, and did not attempt to resolve the issues in good faith. Plaintiffs' response that the first audit is not connected to their claims in this case is not persuasive. To begin with, Plaintiffs' conduct with respect to the first audit is directly relevant to whether Turner Group's resistance to another audit is reasonable. Second, Turner Group raises the unclean hands defense

10

1 not solely because of the first audit, but also because of Plaintiffs' allegedly shifting and inconsistent 2 demands about the second audit and their refusal to meet with Turner Group to respond to its 3 concerns. *See* Turner Group ¶¶ 30, 32, 39, 50. Therefore, a fact finder could reasonably find that 4 Plaintiffs' conduct was inequitable and "directly relates to the claim which it has asserted" against 5 Turner Group. *See Intamin, Ltd.*, 623 F. Supp. 2d at 1074.

6 Accordingly, the court finds that Turner Group's unclean hands defense raises disputed 7 issues of material fact and denies summary judgment on this basis.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs' motion for summary judgment is denied. The court will hold a case management conference on March 3, 2021. The parties shall file a joint CMC statement by February 24, 2021.

**IT IS SO ORDERED.**

Dated: February 11, 2021



Donna M. Ryu
United States Magistrate Judge